**Exhibit 1**
Case 4:24-cv-40141   Document 1-3   Filed 11/04/24   Page 1 of 30

**0074**

# SUBSCRIPTION AGREEMENT AND
# ACCREDITED INVESTOR QUESTIONNAIRE

**THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR THE SECURITIES LAWS OF ANY STATE OR ANY OTHER JURISDICTION. THERE ARE FURTHER RE-STRICTIONS ON THE TRANSFERABILITY OF THE SECURITIES DESCRIBED HEREIN. NEITHER THIS SUBSCRIPTION AGREEMENT NOR ANY OFFERING DOCUMENT RELATED TO THE SECURI-TIES SHALL CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY THE SECURITIES IN ANY JURISDICTION WHERE THE OFFER OR SALE IS NOT PERMITTED OR WOULD BE UNLAWFUL.**

**THE PURCHASE OF THE SECURITIES INVOLVES A HIGH DEGREE OF RISK AND SHOULD BE CONSIDERED ONLY BY PERSONS WHO CAN BEAR THE RISK OF THE LOSS OF THEIR ENTIRE INVESTMENT.**

DMA HOLDINGS (MA), LLC
35 CHASE AVENUE
DUDLEY, MA 01571

Dear Investor:

Pursuant to the terms described in this Subscription Agreement and Accredited Investor Questionnaire (the **"Subscription Agreement"),** the undersigned desires to purchase from DMA HOLDINGS (MA), LLC (the **"Company")**, a Massachusetts limited liability company, the number of Common Member Units (the "**Units**") of the Company described in Section 1 below, pursuant to a private placement by the Company to accredited investors of up to $20,000,004 (the "**Offering**"). The Units are being offered at a price of $12.00 per Unit in the Offering. The Units are referred to herein as **"Securities."**

The undersigned further understands that the Offering is being made on a best efforts basis without regis-tration of the Securities under the Securities Act of 1933, as amended (the **"Securities Act")**, or any se-curities law of any state of the United States or of any other jurisdiction, and is being made only to "ac-credited investors" (as defined in Rule 501 of Regulation D under the Securities Act).

This investment involves a high degree of risk. It is speculative and suitable only for persons who have substantial financial resources and have no need for liquidity in this investment. Further, this investment should only be made by those who understand or have been advised with respect to the tax consequenc-es of and risk factors associated with the investment and who are able to bear the substantial economic risk of the investment for an indefinite period of time. See "**Risk Factors**" beginning on page 9.

1. **Subscription.**

The undersigned hereby subscribes to purchase (i) 8,333.33 Units at a purchase price of $12.00 per Unit, subject to the terms and conditions of this Subscription Agreement. The undersigned hereby delivers to Company the full purchase price of $100,000.00 for the subscription of the Units in the form of a check or wire transfer.

The undersigned understands and agrees that this Subscription Agreement constitutes the binding obli-gation of the undersigned to deliver the full purchase price to the Company for that portion of the Offering that the undersigned is subscribing to, upon acceptance by the Company. As soon as commercially rea-sonable upon the Company's receipt of the completed Subscription Agreement, the undersigned will be notified by the Company whether the undersigned's subscription has been accepted. The Company re-serves the right in its sole discretion to reject all or part of any subscription. If the subscription is not ac-cepted for any reason, the subscription amount will be returned to the undersigned without interest. The undersigned understands and agrees that this subscription shall be binding on the undersigned when this subscription is accepted by the Company.

In the event that this subscription is completed by the undersigned and accepted by the Company, then the cash net proceeds from this subscription will be utilized by the Company immediately. The Units are being offered and sold, and this subscription is being made, pursuant to the terms and conditions set forth in this Subscription Agreement, and the Units shall not be deemed issued to or owned by the undersigned until a duly authorized officer of the Company has signed and delivered to the undersigned notice of ac- ceptance of this Subscription Agreement.



**0074**

# SUBSCRIPTION AGREEMENT AND
# ACCREDITED INVESTOR QUESTIONNAIRE

2.  **Representations and Warranties of the Undersigned.** The undersigned hereby represents and warrants to, and agrees with, the Company as follows:

   a)  **General.**

   i)  The undersigned has all requisite authority (and in the case of an individual, the capacity) to purchase the Securities, enter into this Subscription Agreement and to perform all the obligations required to be performed by the undersigned hereunder, and such purchase will not contravene any law, rule or regulation binding on the undersigned or any investment guideline or restriction applicable to the undersigned.

   ii)  The undersigned is a resident of the state set forth on the signature page hereto and is not acquiring the Securities as a nominee or agent or otherwise for any other person.

   iii)  The undersigned will comply with all applicable laws and regulations in effect in any jurisdiction in which the undersigned purchases or sells Securities and obtain any consent, approval or permission required for such purchases or sales under the laws and regulations of any jurisdiction to which the undersigned is subject or in which the undersigned makes such purchases or sales, and the Company shall have no responsibility therefor.

   b)  **Information Concerning the Company.**

   i)  The undersigned has been furnished an informational presentation package in June 2021 entitled *"DMA Holdings (MA), LLC – Offering of $15,000,000 in LLC Member Units Closing With A $19,750,000 Senior Secured Construction Loan – Proceeds to be Used for the Design, Development and Construction of a Tier 8 Cultivation Facility Integrated With Full Range of Manufacturing Capabilities and Three Retail Facility Expenses"* (the "**PPM**"). The undersigned has been furnished no additional informational literature other than this Subscription Agreement and has relied only on the information contained herein.

   ii)  The PPM includes forward-looking statements about management's expectations of the Company and its future business, including financial projections. These forward-looking statements are based on management's current beliefs and expectations, but involve many assumptions about the future operations of the business of the Company and the legal and regulatory environment pertaining to medical and adult use recreational marijuana and are subject to the multitude of risks facing the business as outlined herein. The undersigned acknowledges that the future results of operations and financial condition of the Company ultimately may not align with any or all of the forward-looking statements included in the PPM, including the financial projections. Further, the undersigned acknowledges that the Company undertakes no duty to update any of the forward-looking statements included in the PPM, including the financial projections.

   iii)  The undersigned understands and accepts that the purchase of the Securities involves various risks, including the risks outlined in this Subscription Agreement. The undersigned represents that it is able to bear any loss associated with an investment in the Securities.

   iv)  The undersigned confirms that it is not relying on any communication (written or oral) of the Company or any of its affiliates, as investment advice or as a recommendation to purchase the Securities. It is understood that information and explanations related to the terms and conditions of the Securities provided in this Subscription Agreement or otherwise by the Company or any of its affiliates shall not be considered investment advice or a recommendation to purchase the Securities, and that neither the Company nor any of its affiliates is acting or has acted as an advisor to the undersigned in deciding to invest in the Securities. The undersigned acknowledges that neither the Company nor any of its affiliates has made any representation regarding the proper characterization of the Securities for purposes of determining the undersigned's authority to invest in the Securities.

   v)  The undersigned is familiar with the business and financial condition and operations of the Company. The undersigned has had access to such information concerning the Company and the Securities as it deems necessary to enable it to make an informed investment deci- sion concerning the purchase of the Securities. The undersigned has had access to and the



## SUBSCRIPTION AGREEMENT AND
## ACCREDITED INVESTOR QUESTIONNAIRE

opportunity to ask questions of management of the Company, and all such questions have been answered by management of the Company to the satisfaction of the undersigned.

vi) The undersigned understands that, unless the undersigned notifies the Company in writing to the contrary at or before the Company's acceptance of this Subscription Agreement, each of the undersigned's representations and warranties contained in this Subscription Agreement will be deemed to have been reaffirmed and confirmed as of the date set forth next to the Company's signature below, taking into account all information received by the undersigned.

vii) The undersigned acknowledges that the Company has the right in its sole and absolute discretion to abandon this private placement at any time prior to the completion of the offering. This Subscription Agreement shall thereafter have no force or effect and the Company shall return the previously paid subscription price of the Securities, without interest thereon, to the undersigned.

viii) The undersigned understands that no federal or state agency has passed upon the merits or risks of an investment in the Securities or made any finding or determination concerning the fairness or advisability of this investment.

ix) The undersigned understands that the Company will be engaged in the business of cultivating, manufacturing, processing, distributing and retailing cannabis products. The undersigned further understands that the legality of operations in the cannabis industry is unclear at the federal level, and as a result, the Company could be prosecuted for violating federal laws. The undersigned understands that this conflict between state and federal law regarding the Company's operations involves a unique set of risks, as more fully described in Sections 3 and 4 of this Subscription Agreement, and the undersigned has had an opportunity to fully understand and assess those risks, and is willing to proceed with an investment in the Company despite those risks.

x) The undersigned understands and acknowledges that the Offering is being conducted on a best efforts basis without a minimum aggregate investment condition. Accordingly, the Company has full discretion to accept the subscription from the undersigned and utilize the investment proceeds even if the Offering is not fully subscribed. If the Offering is not fully-subscribed, the Company may be unable to complete the objectives of the Offering as outlined in the PPM and the undersigned could lose his or her entire investment in the Company.

**c) Non-reliance.**

i) The undersigned acknowledges that, in making the decision to purchase the Securities, it has relied solely upon independent investigations made by the undersigned.

ii) The undersigned confirms that the Company has not (A) given any guarantee or representation as to the potential success, return, effect or benefit (either legal, regulatory, tax, financial, accounting or otherwise) of an investment in the Securities or (B) made any representation to the undersigned regarding the legality of an investment in the Securities under applicable legal investment or similar laws or regulations. In deciding to purchase the Securities, the undersigned is not relying on the advice or recommendations of the Company and the undersigned has made its own independent decision that the investment in the Securities is suitable and appropriate for the undersigned.

**d) Status of Undersigned.**

i) The undersigned has such knowledge, skill and experience in business, financial and investment matters that the undersigned is capable of evaluating the merits and risks of an investment in the Securities. With the assistance of the undersigned's own professional advisors, to the extent that the undersigned has deemed appropriate, the undersigned has made its own legal, tax, accounting and financial evaluation of the merits and risks of an investment in the Securities and the consequences of this Subscription Agreement. The undersigned has considered the suitability of the Securities as an investment in light of its own circumstances and financial condition and the undersigned is able to bear the risks associated with an invest- ment in the Securities and its authority to invest in the Securities.



## SUBSCRIPTION AGREEMENT AND
## ACCREDITED INVESTOR QUESTIONNAIRE

ii) The undersigned is an "**accredited investor**" as defined in Rule 501(a) under the Securities Act. The undersigned agrees to furnish any additional information requested by the Company or any of its affiliates to assure compliance with applicable U.S. federal and state securities laws in connection with the purchase and sale of the Securities. The undersigned acknowledges that the undersigned has completed the Accredited Investor Questionnaire contained in **Appendix A** and that the information contained therein is complete and accurate as of the date thereof and is hereby affirmed as of the date hereof. Any information that has been fur- nished or that will be furnished by the undersigned to evidence its status as an accredited in- vestor is accurate and complete and does not contain any misrepresentation or material omission.

e) **Restrictions on Transfer or Sale of Securities.**  The undersigned acknowledges and is aware of the following:

i) The Securities are a speculative investment and involve a high degree of risk of loss by the undersigned of the undersigned's total investment.

ii) There are substantial restrictions on the transferability of the Securities. The Securities can- not be transferred, pledged, hypothecated, sold or otherwise disposed of unless they are reg- istered under the Securities Act, or an exemption from such registration is available and es- tablished to the satisfaction of the Company; investors in the Company have no rights to re- quire that any transfer of the Securities be registered under the Securities Act; there is no public market for the Securities; and accordingly, the undersigned may have to hold the Se- curities indefinitely; and it may not be possible for the undersigned to liquidate the under- signed's investment in the Company.

iii) There is no current trading market for the Securities, and it is not anticipated that a trading market will occur in the foreseeable future.

iv) The undersigned acknowledges that neither the Company nor any other person offered to  sell the Securities to it by means of any form of general solicitation or advertising, including but not limited to: (A) any advertisement, article, notice or other communication published in any newspaper, magazine or similar media or broadcast over television or radio or (B) any seminar or meeting whose attendees were invited by any general solicitation or general ad- vertising.

3. **Regulatory and Legal Background of the Cannabis Industry**

a) **Massachusetts State Law with Respect to Cannabis**

Massachusetts legalized medical marijuana when voters passed a ballot initiative in 2012. The Massachusetts Medical Use of Marijuana Program was formed pursuant to the Act for the Hu- manitarian Medical Use of Marijuana. Adult use marijuana became legal in Massachusetts as of December 15, 2016, following a ballot initiative in November 2016. Dispensaries for the adult use of cannabis in Massachusetts began operating in July 2018.

b) *Massachusetts Licenses and Regulations*

The Company will be operating within the adult use only sector of Massachusetts' cannabis in- dustry. Massachusetts currently allows adult use only licenses pertaining to cultivation, manufac- turing and retail sales. On 8 October 2020, the Company was granted the following provisional li- censes: (a) a Tier 8 cultivation license, allowing for cultivation of up to 70,000 square feet of total canopy; (b) a manufacturing license, related to the production of marijuana-infused products; and (c) a retail license at its Dudley location. On 3 May 2021, the Company relegated its cultivation li- cense to Tier 6 (up to 50,000 square feet of canopy), reflecting its phased approach to construc- tion. The Company has also entered into a letter of intent to acquire two additional retail licenses in Lynn, MA and Taunton, MA, thereby bringing its total number of retail licenses up to the maxi- mum number allowed for a single entity when those acquisitions are approved by the Massachu- setts Cannabis Control Commission (the "**CCC**").

The Massachusetts Department of Public Health was the regulatory body that oversaw the origi-



# SUBSCRIPTION AGREEMENT AND
# ACCREDITED INVESTOR QUESTIONNAIRE

nal Massachusetts medical program, including all cultivation, processing and dispensary facilities. The CCC, a regulatory body created in 2018, now oversees the medical and adult use programs, including licensing of cultivation, processing and dispensary facilities.

Each Massachusetts dispensary, cultivator and processor license is valid for one year and must be renewed no later than 60 calendar days prior to expiration. The CCC can deny or revoke li- censes and renewals for multiple reasons, including (a) submission of materially inaccurate, in- complete or fraudulent information, (b) failure to comply with any applicable law or regulation, in- cluding laws relating to taxes, child support, workers compensation and insurance coverage, (c) failure to submit or implement a plan of correction, (d) attempting to assign registration to another entity, (e) insufficient financial resources, (f) committing, permitting, aiding or abetting of any ille- gal practices in the operation of the registered marijuana dispensary ("**RMD**"), (g) failure to coop- erate or give information to relevant law enforcement related to any matter arising out of conduct at an RMD and (h) lack of responsible RMD operations, as evidenced by negligence, disorderly  or unsanitary facilities or permitting a person to use a registration card belonging to another per- son.

### c)  *Massachusetts Reporting Requirements*

The Commonwealth of Massachusetts uses the completely web-hosted METRC system as the state's computerized track and trace system for seed-to-sale reporting. Individual licensees, whether directly or through third-party integration systems, are required to push data to the state to meet all reporting requirements. The Company uses an in-house computerized seed-to-sale software, which integrates with the state's program and captures the required data points for cul- tivation, manufacturing and retail as required in the Massachusetts marijuana laws and regula- tions. Such information must be accessible by the Massachusetts Department of Revenue at all times.

### d)  Federal Law with Respect to Cannabis

The cultivation, sale and use of cannabis is illegal under United States federal law pursuant to the Controlled Substance Act (21 U.S.C. §811) (the "**CSA**"). The United States federal government regulates drugs through the CSA, which places controlled substances, including cannabis, in a schedule. Other than industrial hemp, cannabis is classified as a Schedule I drug. Under United States federal law, a Schedule I drug or substance has a high potential for abuse, no accepted medical use in the United States, and a lack of accepted safety for the use of the drug under medical supervision. Under the CSA, the policies and regulations of the United States federal government and its agencies are that cannabis has no medical benefit and a range of activities including cultivation and the personal use of cannabis is prohibited. The United States Food and Drug Administration has not approved cannabis as a safe and effective drug for any indication.

Despite the current state of the federal law and the CSA, medical cannabis is currently legal in 37 states and Washington D.C., Puerto Rico and Guam for patients with certain qualifying condi- tions. The States of Alaska, California, Colorado, Illinois, Maine, Massachusetts, Michigan, Neva- da, Oregon, Vermont, Washington, and the District of Columbia, have legalized recreational use of cannabis, although the District of Columbia has not legalized commercial sale of cannabis. In early 2018, Vermont became the first state to legalize recreational cannabis by passage in a state legislature but does not yet allow commercial sales of recreational cannabis.  On November 3, 2020, the States of Arizona, South Dakota, Montana and New Jersey also passed balloted initia- tives to legalized recreational cannabis as well.

Over half of the U.S. states have enacted legislation to legalize and regulate the sale and use of medical cannabis, provided that there are strict limits on the levels of THC. However, there is no guarantee that state laws legalizing and regulating the sale and use of cannabis will not be re- pealed or overturned, or that local governmental authorities will not limit the applicability of state laws within their respective jurisdictions.  Furthermore, legalization at the state level does not change the fact that marijuana remains illegal under federal law.

Accordingly, cannabis is largely regulated at the state level. State laws that permit and regulate the cultivation, production, distribution and use of cannabis and cannabis-infused products for



## SUBSCRIPTION AGREEMENT AND
## ACCREDITED INVESTOR QUESTIONNAIRE

adult-use or medical purposes are in direct conflict with the CSA. Although certain states authorize medical or adult-use cannabis cultivation, production and distribution by licensed or registered entities, under United States federal law, the possession, use, cultivation, manufacturing, distribution and transfer of cannabis and any related drug paraphernalia is illegal and any such acts are criminal acts. Managing and operating premises used for the operation of marijuana establishments is also illegal under federal law.  The Supremacy Clause of the United States Constitution establishes that the United States Constitution and federal laws made pursuant to it are paramount and in case of conflict between federal and state law, the federal law shall apply.

The inconsistencies between federal and state regulation of cannabis were addressed in a memorandums which then-Deputy Attorney Generals David W. Ogden and James Cole sent to all U.S. District Attorneys, with the last one being sent in August 2013 (the "**Cole Memorandum**"), outlining certain (8) priorities for the DOJ relating to the prosecution of cannabis offenses. The Cole Memorandum acknowledged that, notwithstanding the designation of cannabis as a Sched- ule I controlled substance at the federal level, several states had enacted laws authorizing the  use of cannabis for medical purposes. The Cole Memorandum noted that jurisdictions that have enacted laws legalizing cannabis in some form have also implemented strong and effective regu- latory and enforcement systems to control the cultivation, processing, distribution, sale and pos- session of cannabis. As such, conduct in strict compliance with those laws and regulations is less likely to implicate the Cole Memorandum's enforcement priorities. The DOJ did not provide (and has not provided since) specific guidelines for what regulatory and enforcement systems would be deemed sufficient under the Cole Memorandum. In light of limited investigative and prosecuto- rial resources, the Cole Memorandum concluded that the DOJ should be focused on addressing only the most significant threats related to cannabis, such as distribution of cannabis from states where cannabis is legal to those where cannabis is illegal, the diversion of cannabis revenues to illicit drug cartels and sales of cannabis to minors.  However, the Cole Memorandum reiterated that prosecution of CSA violations remains in the discretion of the U.S. Attorneys acting within their jurisdictions, and that compliance with the Cole Memorandum is not a safe guard or defense to any such prosecution.

On January 4, 2018, former U.S. Attorney General Jeff Sessions issued a new memorandum (the "**Sessions Memorandum**"), which rescinded the Cole Memorandum. The Sessions Memoran- dum stated, in part, that current law reflects "Congress' determination that cannabis is a danger- ous drug and cannabis activity is a serious crime," and Mr. Sessions directed all U.S. Attorneys to enforce the laws enacted by Congress by following well-established principles when pursuing prosecutions related to cannabis activities. The Company is not aware of any prosecutions of li- censed marijuana related businesses operating in compliance with applicable state laws and reg- ulations in light of the new DOJ position. However, there can be no assurance that the federal government will not enforce federal laws relating to cannabis in the future. As a result of the Ses- sions Memorandum, federal prosecutors are now free to utilize their prosecutorial discretion to decide whether to prosecute cannabis activities under the CSA, despite the existence of state- level laws that may be inconsistent with federal prohibitions. No direction was given to federal prosecutors in the Sessions Memorandum as to the priority they should ascribe to such cannabis activities, and thus it is uncertain how active U.S. federal prosecutors will be in relation to such activities.

While federal prosecutors appear to continue to use the Cole Memorandum's priorities as an en- forcement guide, the Company believes it is too soon to determine what prosecutorial effects will be created by the rescission of the Cole Memorandum and the implementation of the Sessions Memorandum. The sheer size of the cannabis industry, in addition to participation by state and local governments and investors, suggests that a large-scale federal enforcement operation  would more than likely create unwanted political backlash for the DOJ and the current administra- tion. It is also possible that the revocation of the Cole Memorandum could motivate Congress to reconcile federal and state laws. Indeed, the U.S. House Judiciary Committee approved a bill on November 20, 2019 that removes cannabis from Schedule I of the CSA. This legislation will next be voted upon by the U.S. House of Representatives. If the bill passes the House of Representa- tives, it will then advance to the U.S. Senate. While Congress is considering legislation that may address these issues, there can be no assurance that such legislation passes. Regardless, at this



## SUBSCRIPTION AGREEMENT AND
## ACCREDITED INVESTOR QUESTIONNAIRE

time, cannabis remains a Schedule I controlled substance at the federal level. The U.S. federal government has always reserved the right to enforce federal law in regard to the sale and disbursement of medical or adult use cannabis, even if state law authorizes such sale and disbursement. It is unclear whether the risk of enforcement has been altered.

On June 7, 2018, the Strengthening the Tenth Amendment Through Entrusting States Act (the "**STATES Act**") was introduced in the Senate by Republican Senator Cory Gardner of Colorado and Democratic Senator Elizabeth Warren of Massachusetts. A companion bill was introduced in the House by Democratic Representative Jared Polis of Colorado. The bill provides in relevant part that the provisions of the CSA, as applied to marijuana, "shall not apply to any person acting in compliance with state law relating to the manufacture, production, possession, distribution, dispensation, administration, or delivery of marihuana." Even though marijuana will remain within Schedule I of the CSA under the STATES Act, the bill makes the CSA unenforceable to the extent it conflicts with state law. In essence, the bill extends the limitations afforded by the protec- tion within the federal budget—which prevents the DOJ and the DEA from using funds to enforce federal law against state-legal medical cannabis commercial activity—to both medical and adult use cannabis activity in all states where it has been legalized. By allowing continued prohibition to be a choice by the individual states, the STATES Act does not fully legalize cannabis on a na- tional level. In that respect, the bill emphasizes states' rights under the Tenth Amendment, which provides that "the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

Under the STATES Act, companies operating legal cannabis businesses would no longer be considered "trafficking" under the CSA, and this could assist financial institutions in transacting with individuals and businesses in the cannabis industry without the threat of money laundering prosecution, civil forfeiture and other criminal violations that could lead to a charter revocation. The STATES Act was reintroduced on April 4, 2019 in both the House and the Senate. Since the STATES Act is currently draft legislation, there is no guarantee that the STATES Act will become law in its current form or in any form.

One legislative safeguard for the medical cannabis industry, appended to the federal budget bill, remains in place following the rescission of the Cole Memorandum. For fiscal years 2015, 2016, 2017 and 2018, Congress adopted a so-called "rider" provision to the Consolidated Appropria- tions Acts (formerly referred to as the Rohrabacher-Farr Amendment and currently referred to as the "**Rohrabacher-Blumenauer Amendment**") to prevent the federal government from using congressionally appropriated funds to enforce federal cannabis laws against regulated medical cannabis actors operating in strict compliance with state and local law. The Rohrabacher-Blumenauer Amendment was included in the fiscal year 2018 budget passed on March 23, 2018. The Rohrabacher-Blumenauer Amendment was included in the consolidated appropriations bill signed into legislation by President Trump in February 2019. In signing the Rohrabacher-Blumenauer Amendment, President Trump issued a signing statement noting that the Rohrabacher-Blumenauer Amendment "provides that the Department of Justice may not use any funds to prevent implementation of medical marijuana laws by various States and territories," and further stating "I will treat this provision consistent with the President's constitutional responsibility to faithfully execute the laws of the United States." On June 20, 2019, the House approved a broader amendment that, in addition to protecting state medical cannabis programs, would also protect state adult use programs. On September 26, 2019, the Senate Appropriations Committee declined to take up the broader amendment but did approve the Rohrabacher-Blumenauer Amendment for the fiscal year 2020 spending bill. On September 27, 2019, the Rohrabacher-Blumenauer Amendment was reviewed as part of a stopgap spending bill, in effect through No- vember 21, 2019.

On February 15, 2019, President Donald Trump signed the 2019 Fiscal Year Appropriations Bill which included the Rohrabacher-Farr Amendment, which prohibits the funding of federal prosecutions with respect to medical cannabis activities that are legal under state law, extending its appli- cation until September 30, 2019. Thereafter, as part of the Congressional omnibus-spending bill, Congress renewed, through September 30, 2020, the Rohrabacher-Farr Amendment. There can be no assurances that the Rohrabacher-Farr Amendment will be included in future appropriations



## SUBSCRIPTION AGREEMENT AND
## ACCREDITED INVESTOR QUESTIONNAIRE

bills or budget resolutions. The Rohrabacher-Blumenauer Amendment may or may not be re-newed as part of a subsequent stopgap spending bill or omnibus appropriations package.

Despite the rescission of the Cole Memorandum, the DOJ appears to continue to adhere to the enforcement priorities set forth in the Core Memorandum. Accordingly, as an industry best prac-tice, the Company will employ the following policies to ensure compliance with the guidance pro-vided by the Cole Memorandum:

- the operations of the Company will be compliant with all licensing and operational re-quirements as established by the applicable state, county, municipality, town, township, borough and other political/administrative divisions; to this end, the Company retains ap-propriately experienced legal counsel to conduct the necessary due diligence to ensure compliance of such operations with all applicable state and local laws;

- the cannabis-related activities will adhere to the scope of the licensing obtained;

- the Company will only work through licensed operators, which must pass a range of re-quirements, adhere to strict business practice standards and be subject to strict regulato-ry oversight to ensure that no revenue is distributed to criminal enterprises, gangs or car-tels;

- the Company will implement an inventory tracking system and necessary procedures to ensure that such compliance system is effective in tracking inventory and preventing di-version of cannabis or cannabis products into those states where cannabis is not permit-ted by state law or cross any state lines in general;

- the Company's state-authorized cannabis business activity will not be used as a cover or pretense for trafficking of other illegal drugs, and the Company will not engage in any other illegal activity or any activities that are contrary to any applicable anti-money laun- dering statutes; and

- the Company will conduct reviews of products and product packaging to ensure that the products comply with applicable regulations and contain necessary disclaimers about the contents of the products to prevent adverse public health consequences from cannabis use and prevent impaired driving.

The Cole Memorandum and the Rohrabacher-Blumenauer Amendment gave licensed cannabis operators (particularly medical cannabis operators) and investors in states with legal regimes greater certainty regarding the DOJ's enforcement priorities and the risk of operating cannabis businesses. While the Sessions Memorandum introduced some uncertainty regarding federal en-forcement, the cannabis industry continues to experience growth in legal medical and adult use markets across the United States. U.S. Attorney General Jeff Sessions resigned on November 7, 2018. On February 14, 2019, William Barr was confirmed as U.S. Attorney General.

The Department of Justice under Mr. Barr has not taken a formal position on federal enforcement of laws relating to cannabis. Mr. Barr has stated publicly that his preference would be to have a uniform federal rule against cannabis, but, absent such a uniform rule, his preference would be to permit the existing federal approach of leaving it up to the states to make their own decisions. At-torney General William Barr's statements are not official declarations of the U.S. Department of Justice ("**DOJ**") policy, are not binding on the DOJ, on any U.S. Attorney, or on the federal courts. Attorney General William Barr may clarify, retract, or contradict these statements. There is no guarantee that the position of the Department of Justice will not change. If the Department of Jus-tice policy was to aggressively pursue financiers or equity owners of cannabis-related business-es, and United States Attorneys followed such Department of Justice policies through pursuing prosecutions, then the Company could face (i) seizure of its cash and other assets used to sup-port or derived from its cannabis subsidiaries, and (ii) the arrest of its employees, directors, offic-ers, managers and investors, who could face charges of ancillary criminal violations of the CSA for aiding and abetting and conspiring to violate the CSA by virtue of providing financial support to state-licensed or permitted cultivators, processors, distributors, and/or retailers of cannabis.

The Company's objective is to capitalize on the opportunities presented as a result of the chang-



## SUBSCRIPTION AGREEMENT AND
## ACCREDITED INVESTOR QUESTIONNAIRE

ing regulatory environment governing the cannabis industry in the United States. Accordingly, there are a number of significant risks associated with the business of the Company, as outlined in Section 3 – "Risk Factors." Unless and until the United States Congress amends the CSA with respect to medical and/or adult-use cannabis (and as to the timing or scope of any such potential amendments there can be no assurance), there is a significant risk that federal authorities may enforce current U.S. federal law, and the business of the Corporation may be deemed to be pro-ducing, cultivating, extracting, or dispensing cannabis or aiding or abetting or otherwise engaging in a conspiracy to commit such acts in violation of federal law in the United States. If the U.S. federal government begins to enforce U.S. federal laws relating to cannabis in states where the sale and use of cannabis is currently legal, or if existing applicable state laws are repealed or cur- tailed, the Corporation's business, results of operations, financial condition and prospects would be materially adversely affected.

**e)   Restricted Access to Banking and Other Financial Services**

The U.S. Department of the Treasury's Financial Crimes Enforcement Network ("**FinCEN**") issued a memorandum on February 14, 2014 (the "**FinCEN Memorandum**") with respect to financial in-stitutions providing banking services to cannabis businesses.  On the same date, U.S. Deputy At-torney General James M. Cole issued a separate memorandum to the U.S. Attorneys, providing guidance regarding marijuana related financial crimes (the "**Second Cole Memorandum**"). These include burdensome due diligence expectations and reporting requirements. The FinCEN Memorandum outlines the pathways for financial institutions to bank state-sanctioned cannabis businesses in compliance with federal enforcement priorities. The FinCEN Memorandum echoed the enforcement priorities of the Cole Memorandum and states that, in some circumstances, it is permissible for banks to provide services to cannabis-related businesses without risking prosecu-tion for violation of federal money laundering laws. Under these guidelines, financial institutions must submit a marijuana-related Suspicious Activity Report ("**SAR**") in connection with all canna-bis-related banking activities by any client of such financial institution, in accordance with federal money laundering laws.

These marijuana-related SARs are divided into three categories—marijuana limited, marijuana priority, and marijuana terminated—based on the financial institution's belief that the business in question triggers one of the eight Cole Memorandum priorities, follows state law, is operating out-side of compliance with state law, or where the banking relationship has been terminated, respec-tively.

Former U.S. Attorney General Sessions' revocation of the Cole Memorandum has not affected  the status of the FinCEN Memorandum, nor has the Department of the Treasury given any indica- tion that it intends to rescind the FinCEN Memorandum itself. Shortly after the Sessions Memo- randum was issued, FinCEN did state that it would review the FinCEN Memorandum, but FinCEN has not yet issued further guidance. The FinCEN Memorandum is a standalone document which explicitly lists the eight enforcement priorities originally cited in the Cole Memorandum. As such, the FinCEN Memorandum remains intact, indicating that the Department of the Treasury and FinCEN intend to continue abiding by its guidance.

However, the FinCEN Memorandum does not provide any safe harbors or legal defenses from examination or regulatory or criminal enforcement actions by the DOJ, FinCEN or other federal regulators. Thus, most banks and other financial institutions in the United States do not appear comfortable providing banking services to cannabis-related businesses or relying on this guid-ance, given that it has the potential to be amended or revoked by the current administration. In addition to the foregoing, banks may refuse to process debit card payments and credit card com-panies generally refuse to process credit card payments for cannabis-related businesses. As a result, the Company may have limited or no access to banking or other financial services in the United States. In addition, federal money laundering statutes and regulations under the U.S. Cur-rency and Foreign Transactions Reporting Act of 1970 (commonly known as the "**Bank Secrecy Act**"), as amended by Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "**USA Patriot Act**"), discour-age financial institutions from working with any organization that sells a controlled substance, re-gardless of whether the state it operates in permits cannabis sales. The inability or limitation of



## SUBSCRIPTION AGREEMENT AND
## ACCREDITED INVESTOR QUESTIONNAIRE

the Company's ability to open or maintain bank accounts, obtain other banking services and/or accept credit card and debit card payments may make it difficult for the Company to operate and conduct its business as planned or to operate efficiently.

Banks and other financial institutions are currently hindered by federal law from providing finan- cial services to marijuana businesses, even in states where those businesses are regulated. On March 7, 2019, Democratic representative Ed Perlmutter of Colorado introduced house bill H.R. 1595, known as the Secure and Fair Enforcement Banking Act of 2019 (the "**SAFE Banking Act**"), which would protect banks and their employees from punishment for providing services to cannabis businesses that are legal on a state level. The bill was advanced by the House Finan- cial Services Committee on March 28, 2019 and passed with strong bipartisan support in the House of Representatives on September 25, 2019. Some industry observers anticipate that the bill will be signed into law within the next year, which would, as noted above, allow financial insti- tutions to provide services to marijuana related businesses without risk of violating federal money laundering statutes.

4. **Risk Factors.**

**THE SECURITIES OFFERED HEREBY INVOLVE A HIGH DEGREE OF RISK AND THEIR PUR- CHASE SHOULD BE CONSIDERED ONLY BY PERSONS WHO CAN AFFORD TO SUSTAIN A TOTAL LOSS OF THEIR INVESTMENT. THERE CAN BE NO ASSURANCE THAT THE COMPA- NY WILL BE COMMERCIALLY VIABLE. PROSPECTIVE PURCHASERS SHOULD CAREFULLY CONSIDER, AMONG OTHER FACTORS, THE FOLLOWING:**

### *The Company has no operating history.*

The Company is still in an early phase and is just beginning to implement its business plan. The Company has engaged in no revenue-producing activities to date and potentially expects to incur losses for an unforeseeable period of time. There can be no assurance that the Company will ever operate profitably. The likelihood of its success should be considered in light of the problems, ex- penses, difficulties, complications and delays usually encountered by companies in their early stages of development. The Company may not be successful in attaining the objectives necessary for it to overcome these risks and uncertainties.

### *The Company may need additional capital, which may not be available.*

The Company may require funds in excess of its existing cash resources to fund operating deficits, develop new products or services, establish and expand its marketing capabilities, and finance gen- eral and administrative activities.

Due to market conditions at the time, the Company may need additional funding, or due to its finan- cial condition at that time, it is possible that the Company will be unable to obtain additional funding as and when it needs it. If the Company is unable to obtain additional funding, it may not be able to repay debts when they are due and payable. If the Company is able to obtain capital it may be on un- favorable terms or terms which excessively dilute then-existing equity holders. If the Company is un- able to obtain additional funding as and when needed, it could be forced to delay its development, marketing and expansion efforts and, if it continues to experience losses, potentially cease opera- tions.

### *The ongoing COVID-19 pandemic and measures intended to prevent its spread could have a material adverse effect on our business, results of operations, cash flows and financial condition.*

The novel coronavirus commonly referred to as "**COVID-19**" was identified in December 2019 in Wu- han, China. On January 30, 2020, the World Health Organization declared the outbreak a global health emergency, and on March 11, 2020, the spread of COVID-19 was declared a pandemic by the World Health Organization. On March 13, 2020, the spread of COVID-19 was declared a national emergency by President Donald Trump. The outbreak has spread throughout Europe, the Middle East and North America, causing companies and various international jurisdictions to impose re- strictions such as quarantines, business closures and travel restrictions. While these effects are ex-



## SUBSCRIPTION AGREEMENT AND
## ACCREDITED INVESTOR QUESTIONNAIRE

pected to be temporary, the duration of the business disruptions internationally and related financial impact cannot be reasonably estimated at this time.

The rapid development of the COVID-19 pandemic and the measures being taken by governments and private parties to respond to it are extremely fluid. While the Company has continuously sought to assess the potential impact of the pandemic on its financial and operating results, any assessment is subject to extreme uncertainty as to probability, severity and duration. The Company has attempted  to assess the impact of the pandemic by identifying risks in the following principle areas.

- Mandatory Closure.  In response to the pandemic, many states and localities have implemented mandatory closure of business to prevent spread of COVID-19. Effective March 24, 2020, Massachusetts Governor Charlie Baker ordered the closure of all adult-use dispensaries. Although medical dispensary sales were permitted, all adult-use sales were prohibited through the duration of the order. On May 25, 2020, Governor Charlie Baker permitted the resumption of adult-use sales. The Company's ability to generate revenue would be materially impacted by any future  shut down of adult-use dispensaries.

- Customer Impact.  If the Company's future customers become ill with COVID-19, are forced to quarantine, decide to self-quarantine or not to visit its stores or distribution points to observe "social distancing", it may have material negative impact on demand for the Company's products while the pandemic continues. While the Company will implement measures, where permitted, such as "curb side" sales and delivery, to reduce infection risk to our customers, regulators may not permit such measures, or such measures may not prevent a reduction in demand.

- Supply Chain Disruption.  The Company will rely on third party suppliers for equipment and services to produce its products and keep its operations going. If its suppliers are unable to continue operating due to mandatory closures or other effects of the pandemic, it may negatively impact the Company's own ability to continue operating. Disruptions in the Company's supply chain may affect its ability to continue certain aspects of the Company's operations or may significantly in- crease the cost of operating its business and significantly reduce its margins.

- Staffing Disruption.  The Company will implement among its staff where feasible "social distancing" measures recommended by such bodies as the Centers for Disease Control, the Presidential Administration, as well as state and local governments. For those whose duties require them to work on-site, measures will be implemented to reduce infection risk, such as reducing contact  with customers, mandating additional cleaning of workspaces and hand disinfection, providing masks and gloves to certain personnel. Nevertheless, despite such measures, the Company may find it difficult to ensure that its operations remain staffed due to employees falling ill with COVID- 19, becoming subject to quarantine, or deciding not to come to work on their own volition to avoid infection.

- Regulatory Backlog.  Regulatory authorities, including those that oversee the cannabis industry on the state level, are heavily occupied with their response to the pandemic. These regulators as well as other executive and legislative bodies in the Commonwealth of Massachusetts may not be able to provide the level of support and attention to day-to-day regulatory functions as well as to needed regulatory development and reform that they would otherwise have provided. Such regu- latory backlog may materially hinder the development of the Company's business by delaying such activities as product launches and facility openings, thus materially impeding development  of its business.

The Company will actively address the risk to business continuity represented by each of the above factors through the implementation of a broad range of measures throughout its structure and the reassessment of its response to the COVID-19 pandemic on an ongoing basis. The above risks individually or collectively may have a material impact on the Company's ability to generate revenue. Implementing measures to remediate the risks identified above may materially increase our costs of doing business, reduce our margins and potentially result in losses.

### *Continued control by management.*

After completion of the Offering made hereby, the managers of the Company will exercise voting con-



## SUBSCRIPTION AGREEMENT AND
## ACCREDITED INVESTOR QUESTIONNAIRE

trol over the Company. The interests of such persons may differ from the interests of the Company's other members, including purchasers of Units in the Offering. As a result, in addition to their position as managers and officers, such persons will have significant influence over and control all corporate actions requiring member approval, irrespective of how the Company's other members, including purchasers in the Offering, may vote, including the following actions:

- to elect or defeat the election of the Company's managers;

- to amend or prevent amendment of the Company's Certificate of Organization or Operating Agreement;

- to effect or prevent a merger, sale of assets or other corporate transaction; and to control the outcome of any other matter submitted to the Company's members for vote.

### *The Company's management will have broad discretion in how the Company uses the net proceeds of the Offering.*

The Company's management will have considerable discretion over the use of proceeds from the Offering. You may not have the opportunity, as part of your investment decision, to assess whether the proceeds are being used appropriately.

### *Dependence on management.*

The success of the Company depends to a large degree upon the personal efforts and ability of its executive officers and key members of management, the loss of whose services would have a materially adverse effect on the Company.

### *The Company may not be able to manage its potential growth.*

The Company is anticipating meaningful potential growth. This growth, if accomplished, may place a significant strain on the Company's management, operational and financial resources. To manage any material growth, the Company will be required to implement operational and financial systems, procedures and controls. It also will be required to expand its finance, administrative and operations staff. There can be no assurance that the Company's current and planned personnel, systems, procedures and controls will be adequate to support its future operations at any increased level. The Company's failure to manage growth effectively could have a material adverse effect on its business, results of operations and financial condition.

### *The Company faces intense competition.*

The Company faces intense competition from other companies, some of which have longer operating histories and more financial resources and manufacturing and marketing experience than the Company. Increased competition by larger and better financed competitors could materially and adversely affect the business, financial condition and results of operations of the Company.

Because of the early stage of the industry in which the Company operates, the Company faces additional competition from new entrants. If the number of consumers of cannabis in Massachusetts increases, the demand for products will increase and the Company expects that competition will become more intense, as current and future competitors begin to offer an increasing number of diversified products. To remain competitive, the Company will require a continued high level of investment in research and development, marketing, sales and client support. The Company may not have suffi- cient resources to maintain research and development, marketing, sales and client support efforts on a competitive basis, which could materially and adversely affect the business, financial condition and results of its operations.

### *The Company is not subject to Sarbanes-Oxley regulations and may lack the financial controls and procedures of public companies.*

The Company may not develop the internal control infrastructure that would meet the standards of a public company, including the requirements of the Sarbanes Oxley Act of 2002. As a privately-held (non-public) company, the Company is currently not subject to the Sarbanes Oxley Act of 2002, and it's financial and disclosure controls and procedures reflect its status as a development stage, non-



## SUBSCRIPTION AGREEMENT AND
## ACCREDITED INVESTOR QUESTIONNAIRE

public company. There can be no guarantee that there are no significant deficiencies or material weaknesses in the quality of the Company's financial and disclosure controls and procedures. If it were necessary to implement such financial and disclosure controls and procedures, the cost to the Company of such compliance could be substantial and could have a material adverse effect on the Company's results of operations.

***The Company does not have audited financial statements nor is it required to provide investors with any annual audited financial statements or quarterly unaudited financial statements.***

The Company may not have audited financial statements or audited balance sheets reviewed by outside auditors. In addition, the Company is not required to provide investors in the Offering with financial information concerning the Company to which the investors may use in analyzing an investment in the Company. The limited information provided herewith with which investors will make an invest- ment decision may not completely or accurately represent the financial condition of the Company. Furthermore, the Company is not required to provide you with annual audited financial statements or quarterly unaudited financial statements.

***Marijuana remains illegal under federal law, and enforcement of cannabis laws could change.***

**Please refer to Section 3 – "Regulatory and Legal Background of the Cannabis Industry" for more detailed information regarding regulation and the legal standing of cannabis.**

Cannabis is illegal under U.S. federal law. In those states in which the use of cannabis has been legalized, its use remains a violation of federal law pursuant to the CSA. The CSA classifies cannabis as a Schedule I controlled substance, and as such, medical and adult use cannabis use is illegal un- der U.S. federal law. Unless and until Congress amends the CSA with respect to cannabis (and the President approves such amendment), there is a risk that federal authorities may enforce current federal law. If that occurs, the Company may be deemed to be producing, cultivating or dispensing cannabis and drug paraphernalia in violation of federal law. Since federal law criminalizing the use of cannabis pre-empts state laws that legalize its use, enforcement of federal law regarding cannabis is a significant risk and would greatly harm the Company's business, prospects, revenue, results of operation and financial condition.

The activities of the Company are, and will continue to be, subject to evolving regulation by governmental authorities. The Company is directly or indirectly engaged in the medical and adult use cannabis industry in the United States where local state law permits such activities. The legality of the production, cultivation, extraction, distribution, retail sales, transportation and use of cannabis differs among states in the United States. Due to the current regulatory environment in the United States, new risks may emerge, and management may not be able to predict all such risks.

As of 1 July 2021, medical cannabis is legal in 37 states and Washington D.C., Puerto Rico and Guam for patients with certain qualifying conditions. As of 1 July 2021, recreational adult-use of can- nabis is legal in 18 states and four United States territories. On November 3, 2020, the States of Ari- zona, Montana, South Dakota and New Jersey passed ballot initiatives legalizing recreational adult- use marijuana.

The Company's activities in the recreational adult-use cannabis industry may be illegal under the applicable federal laws of the United States. There can be no assurances that the federal government of the United States will not seek to enforce the applicable laws against the Company. The consequences of such enforcement would be materially adverse to the Company and the Company's business, including its reputation and profitability, and could result in the forfeiture or seizure of all or substantially all of the Company's assets.

Section 3 provides a more complete description of the issues related to the conflicting views between state legislatures and the federal government regarding cannabis, and the inconsistent laws and regulations to which cannabis businesses are subject. The uncertainty of U.S. federal enforcement practices going forward and the inconsistency between U.S. federal and state laws and regulations present major risks for the Company.



## SUBSCRIPTION AGREEMENT AND
## ACCREDITED INVESTOR QUESTIONNAIRE

***The Company may be subject to action by the U.S. federal government.***

**Please refer to Section 3 – "Regulatory and Legal Background of the Cannabis Industry" for more detailed information regarding regulation and the legal standing of cannabis.**

Since the cultivation, processing, production, distribution and sale of cannabis for any purpose, medical, recreational adult-use or otherwise, remain illegal under U.S. federal law, it is possible that the Company may be forced to cease activities and subject to federal criminal prosecution. The U.S. federal government, through, among others, the DOJ, its sub-agency the Drug Enforcement Administration ("**DEA**") and the U.S. Internal Revenue Service (the "**IRS**"), has the right to actively investigate, audit and shut down cannabis-related businesses. The U.S. federal government may also attempt to seize the property of the Company. Any action taken by the DOJ, the DEA and/or the IRS to interfere with, seize or shut down the operations of the Company will have an adverse effect on the Compa- ny's business, prospects, revenue, results of operation and financial condition.

Since federal law criminalizing the use of cannabis pre-empts state laws that legalize its use, the federal government can assert criminal violations of federal law despite state laws permitting the use of cannabis. While it does not appear that federal law enforcement and regulatory agencies are focusing resources on licensed marijuana related businesses that are operating in compliance with state law, the stated position of the current administration is hostile to legal cannabis. As the recession of the Cole Memorandum and the implementation of the Sessions Memorandum demonstrate, the DOJ may at any time issue additional guidance that directs federal prosecutors to devote more resources to prosecuting marijuana related businesses. In the event that the DOJ aggressively pursues financiers or equity owners of cannabis-related businesses, and U.S. Attorneys follow the DOJ policies through pursuing prosecutions, then the Company could face:

1.  seizure of its cash and other assets used to support or derived from its cannabis subsidiaries;

2.  the arrest of its employees, directors, officers, managers and investors; and

3.  ancillary criminal violations of the CSA for aiding and abetting, and conspiracy to violate the CSA by providing financial support to cannabis companies that service or provide goods to state-licensed or permitted cultivators, processors, distributors and/or retailers of cannabis.

Because the Cole Memorandum was rescinded, the DOJ under the current administration or an aggressive federal prosecutor could allege that the Company and its board of directors and, potentially, its equity owners, directly violated or "aided and abetted" violations of federal law by providing finances and services to its portfolio cannabis companies. The DOJ could also prosecute under the federal Racketeer Influenced and Corrupt Organizations ("**RICO**") statute. Under these circumstances, federal prosecutors could seek to seize the assets of the Company, and to recover the "illicit profits" previously distributed to members resulting from any of the Company's financing or services. In these circumstances, the Company's operations would cease, members may lose their entire investments and directors, officers and/or members may be left to defend any criminal charges against them at their own expense and, if convicted, be sent to federal prison.

Additionally, there can be no assurance as to the position any new administration may take on marijuana, and a new administration could decide to enforce the federal laws strongly. Any enforcement of current federal marijuana laws could cause significant financial damage to the Company and its members. Further, future presidential administrations may choose to treat marijuana differently and potentially enforce the federal laws more aggressively.

Violations of any federal laws and regulations could result in significant fines, penalties, administrative sanctions, convictions or settlements arising from civil proceedings conducted by either the federal government or private citizens, or criminal charges, including, but not limited to, disgorgement of profits, cessation of business activities or divestiture. These results could have a material adverse effect on the Company, including its reputation and ability to conduct business, its holding (directly or indirectly) of cannabis licenses in the United States, the listing of its securities on various stock exchanges, its financial position, operating results, profitability or liquidity. In addition, it is difficult to estimate the time or resources that would be needed for the investigation or final resolution of any such mat- ters because: (i) the time and resources that may be needed depend on the nature and extent of any



## SUBSCRIPTION AGREEMENT AND
## ACCREDITED INVESTOR QUESTIONNAIRE

information requested by the authorities involved, and (ii) such time or resources could be substantial.

### *State regulation of cannabis is uncertain.*

**Please refer to Section 3 – "Regulatory and Legal Background of the Cannabis Industry" for more detailed information regarding regulation and the legal standing of cannabis.**

There is no assurance that state laws legalizing and regulating the sale and use of cannabis will not be repealed or overturned, or that local governmental authorities will not limit the applicability of state laws within their respective jurisdictions. If the U.S. federal government begins to enforce U.S. federal laws relating to cannabis in states where the sale and use of cannabis is currently legal, or if existing state laws are repealed or curtailed, the Company's business or operations in those states or under those laws would be materially and adversely affected. Federal actions against any individual or entity engaged in the cannabis industry or a substantial repeal of cannabis related legislation could adversely affect the Company, its business and its assets or investments.

The rulemaking process at the state level that applies to cannabis operators in any state will be ongoing and result in frequent changes. As a result, a compliance program is essential to manage regulatory risk. All operating policies and procedures implemented by the Company are compliance-based and are derived from the state regulatory structure governing ancillary cannabis businesses and their relationships to state-licensed or permitted cannabis operators, if any. Notwithstanding the Company's efforts and diligence, regulatory compliance and the process of obtaining regulatory approvals can be costly and time-consuming. No assurance can be given that the Company will receive the requisite licenses, permits or cards to continue operating its businesses.

In addition, local laws and ordinances could restrict the Company's business activity. Although the Company's operations are legal under the laws of the Commonwealth of Massachusetts, local governments have the ability to limit, restrict and ban cannabis businesses from operating within their jurisdiction. Land use, zoning, local ordinances and similar laws could be adopted or changed and have a material adverse effect on the Company's business.

Multiple states where medical and/or adult use cannabis is legal have or are considering special taxes or fees on businesses in the marijuana industry. It is uncertain at this time whether other states are in the process of reviewing such additional taxes and fees. The implementation of special taxes or fees could have a material adverse effect upon the Company's business, prospects, revenue, results of operation and financial condition.

### *State regulatory agencies may require the Company to post bonds or significant fees.*

There is a risk that the Commonwealth of Massachusetts will begin requiring entities engaged in certain aspects of the business or industry of legal marijuana to post a bond or significant fees when applying, for example, for a dispensary license or renewal as a guarantee of payment of sales and franchise taxes. The Company is not able to quantify at this time the potential scope of such bonds or fees. Any bonds or fees of material amounts could have a negative impact on the ultimate success of the Company's business.

### *The Company may become subject to FDA or ATF regulation.*

Cannabis remains a Schedule I controlled substance under U.S. federal law. If the federal government reclassifies cannabis to a Schedule II controlled substance, it is possible that the FDA would seek to regulate cannabis under the Food, Drug and Cosmetics Act of 1938. Additionally, the FDA may issue rules and regulations, including good manufacturing practices, related to the growth, cultivation, harvesting and processing of medical cannabis. Clinical trials may be needed to verify the efficacy and safety of cannabis. It is also possible that the FDA would require facilities where medical use cannabis is grown to register with the FDA and comply with certain federally prescribed regulations. In the event that some or all of these regulations are imposed, the impact they would have on the cannabis industry is unknown, including the costs, requirements and possible prohibitions that may be enforced. If the Company is unable to comply with the potential regulations or registration requirements prescribed by the FDA, it may have an adverse effect on the Company's business, prospects, revenue, results of operation and financial condition.



## SUBSCRIPTION AGREEMENT AND
## ACCREDITED INVESTOR QUESTIONNAIRE

It is also possible that the federal government could seek to regulate cannabis under the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives ("**ATF**"). The ATF may issue rules and regulations related to the use, transporting, sale and advertising of cannabis or cannabis products, including smokeless cannabis products.

***Cannabis businesses are subject to applicable anti-money laundering laws and regulations and have restricted access to banking and other financial services.***

**Please refer to Section 3(e) – "Restricted Access to Banking and Other Financial Services" for more detailed information regarding this risk factor.**

The Company is subject to a variety of laws and regulations in the United States that involve money laundering, financial record-keeping and proceeds of crime, including the Bank Secrecy Act, as amended by Title III of the USA Patriot Act, and any related or similar rules, regulations or guidelines, issued, administered or enforced by governmental authorities in the United States. Accordingly, pursuant to the Bank Secrecy Act, banks or other financial institutions that provide a cannabis business with a checking account, debit or credit card, small business loan or any other service could be found guilty of money laundering, aiding and abetting, or conspiracy.

The FinCEN Memorandum and Second Cole Memorandum were issued on February 14, 2014, outlining guidance and best practices for financial institutions to bank cannabis businesses in compliance with federal enforcement priorities. The FinCEN Memorandum refers to the Cole Memorandum's enforcement priorities. The revocation of the Cole Memorandum has not yet affected the status of the FinCEN Memorandum, nor has FinCEN given any indication that it intends to rescind the FinCEN Memorandum itself. Shortly after the Sessions Memorandum was issued, FinCEN did state that it would review the FinCEN Memorandum, but FinCEN has not yet issued further guidance.

Although the FinCEN Memorandum remains intact, it is unclear whether the current administration will continue to follow its guidelines. The DOJ continues to have the right and power to prosecute crimes committed by banks and financial institutions, such as money laundering and violations of the Bank Secrecy Act, that occur in any state including states that have in some form legalized the sale of cannabis. Further, the conduct of the DOJ's enforcement priorities could change for any number of reasons. A change in the DOJ's priorities could result in the prosecution of banks and financial institutions for crimes that were not previously prosecuted.

If the Company's operations, or proceeds thereof, dividend distributions or profits or revenues derived from the Company's operations were found to be in violation of money laundering legislation or otherwise, such transactions may be viewed as proceeds from a crime (the sale of a Schedule I drug) under the Bank Secrecy Act's money laundering provisions. This may restrict the ability of the Company to declare or pay dividends or effect other distributions.

The FinCEN Memorandum does not provide any safe harbors or legal defenses from examination or regulatory or criminal enforcement actions by the DOJ, FinCEN or other federal regulators. Thus, most banks and other financial institutions in the United States are still not comfortable providing banking services to cannabis-related businesses or relying on this guidance given that it has the po- tential to be amended or revoked by the current administration. In addition to the foregoing, banks may refuse to process debit card payments and credit card companies generally refuse to process credit card payments for cannabis-related businesses. As a result, the Company may have limited or no access to banking or other financial services in the United States. In addition, federal money laun- dering statutes and Bank Secrecy Act regulations discourage financial institutions from working with any organization that sells a controlled substance, regardless of whether the state it operates in per- mits cannabis sales. The inability or limitation of the Company's ability to open or maintain bank ac- counts, obtain other banking services and/or accept credit card and debit card payments may make it difficult for the Company to operate and conduct its business as planned or to operate efficiently.

Banks and other depository institutions are currently hindered by federal law from providing financial services to marijuana businesses, even in states where those businesses are regulated. On March 7, 2019, Democratic representative Ed Perlmutter of Colorado introduced house bill H.R. 1595, known as the SAFE Banking Act, which would protect banks and their employees from punishment for providing services to cannabis businesses that are legal on a state level. The bill was advanced by



## SUBSCRIPTION AGREEMENT AND
## ACCREDITED INVESTOR QUESTIONNAIRE

the House Financial Services Committee on March 28, 2019 and passed with strong bipartisan sup-port in the House of Representatives on September 25, 2019. Some industry observers anticipate that the bill will be signed into law within the next year, which would, as noted above, allow financial institutions to provide services to marijuana related businesses without risk of violating federal money laundering statutes.

### *The Company may face difficulties acquiring additional financing.*

The Company may require equity and/or debt financing to support on-going operations, to undertake capital expenditures or to undertake acquisitions and/or other business combination transactions. There can be no assurance that additional financing will be available to the Company when needed or on terms which are acceptable. The Company's inability to raise financing through traditional bank- ing to fund on-going operations, capital expenditures or acquisitions could limit its growth and may have a material adverse effect upon the Company's business, prospects, revenue, results of opera- tion and financial condition.

### *The Company lacks access to U.S. bankruptcy protections.*

Many courts have denied cannabis businesses bankruptcy protections because the use of cannabis is illegal under federal law. In the event of a bankruptcy, it would be very difficult for lenders to recoup their investments in the cannabis industry. If the Company were to experience a bankruptcy, there is no guarantee that U.S. federal bankruptcy protections would be available to the Company, which would have a material adverse effect on the Company.

### *The Company operates in a highly regulated sector and may not always succeed in complying fully with applicable regulatory requirements in all jurisdictions where we carry on business.*

Our operations will be subject to various laws, regulations and guidelines by state and local govern-mental authorities relating to the cultivation, manufacture, marketing, management, transportation, storage, sale, pricing and disposal of cannabis and cannabis-infused products, and also including laws and regulations relating to health and safety, insurance coverage, the conduct of operations and the protection of the environment. Laws and regulations, applied generally, grant government agen- cies and self-regulatory bodies broad administrative discretion over our activities, including the power to limit or restrict business activities as well as impose additional disclosure requirements on our products and services. Achievement of our business objectives is contingent, in part, upon compli- ance with regulatory requirements enacted by these governmental authorities and obtaining all nec- essary regulatory approvals for the manufacture, production, storage, transportation, sale, import and export, as applicable, of our products. The commercial cannabis industry is still a new industry at the state and local level. The effect of relevant governmental authorities' administration, application and enforcement of their respective regulatory regimes and delays in obtaining, or failure to obtain, appli- cable regulatory approvals which may be required may significantly delay or impact the development of markets, products and sales initiatives and could have a material adverse effect on our business, prospects, revenue, results of operation and financial condition.

While we will endeavor to comply with all relevant laws, regulations and guidelines, any failure to comply with the regulatory requirements applicable to our operations may lead to possible sanctions including the revocation or imposition of additional conditions on licenses to operate our business; the suspension or expulsion from a particular market or jurisdiction or of our key personnel; the imposition of additional or more stringent inspection, testing and reporting requirements; and the imposition of fines and censures. In addition, changes in regulations, more vigorous enforcement thereof or other unanticipated events could require extensive changes to our operations, increase compliance costs or give rise to material liabilities and/or revocation of our licenses and other permits, which could have a material adverse effect on our business, results of operations and financial condition. Furthermore, governmental authorities may change their administration, application or enforcement procedures at any time, which may adversely impact our ongoing costs relating to regulatory compliance.

### *The Company may face difficulties in enforcing its contracts.*

Because the Company's contracts involve cannabis and other activities that are not legal under fed-



# SUBSCRIPTION AGREEMENT AND
## ACCREDITED INVESTOR QUESTIONNAIRE

eral law and in some state jurisdictions, the Company may face difficulties in enforcing its contracts in federal courts and certain state courts. The Company cannot be assured that it will have a remedy for breach of contract, which could have a material adverse effect on the Company.

### *The Company has limited trademark protection.*

The Company will not be able to register any federal trademarks for its cannabis products. Because producing, manufacturing, processing, possessing, distributing, selling and using cannabis is a crime under the CSA, the U.S. Patent and Trademark Office will not permit the registration of any trademark that identifies cannabis products. As a result, the Company likely will be unable to protect its cannabis product trademarks beyond the geographic areas in which it conducts business. The use of the Company's trademarks outside the states in which it operates by one or more other persons could have a material adverse effect on the value of such trademarks.

### *The Company may be subject to constraints on marketing its products.*

There may be restrictions on sales and marketing activities imposed by government regulatory bodies that can hinder the development of the Company's business and operating results. Restrictions may include regulations that specify what, where and to whom product information and descriptions may appear and/or be advertised. Marketing, advertising, packaging and labeling regulations also vary from state to state, potentially limiting the consistency and scale of consumer branding communica- tion and product education efforts. The regulatory environment in the U.S. limits the Company's ability to compete for market share in a manner similar to other industries. If the Company is unable to effec- tively market its products and compete for market share, or if the costs of compliance with govern- ment legislation and regulation cannot be absorbed through increased selling prices for its products, the Company's sales and operating results could be adversely affected.

### *The Company faces risks related to the results of future clinical research.*

Research regarding the medical benefits, viability, safety, efficacy, dosing and social acceptance of cannabis or isolated cannabinoids (such as CBD and THC) remains in early stages. There have been relatively few clinical trials on the benefits of cannabis or isolated cannabinoids (such as CBD and THC). Although the Company believes that various articles, reports and studies support its beliefs re- garding the medical benefits, viability, safety, efficacy, dosing and social acceptance of cannabis, fu- ture research and clinical trials may prove such statements to be incorrect, or could raise concerns regarding, and perceptions relating to, cannabis. Given these risks, uncertainties and assumptions, prospective purchasers of Units should not place undue reliance on such articles and reports. Future research studies and clinical trials may draw opposing conclusions to those stated herein or reach negative conclusions regarding the medical benefits, viability, safety, efficacy, dosing, social ac- ceptance or other facts and perceptions related to cannabis, which could have a material adverse ef- fect on the demand for the Company's products, with the potential to have a material adverse effect on the Company's business, prospects, revenue, results of operation and financial condition.

### *Cannabis businesses are subject to unfavorable tax treatment.*

Under Section 280E of the Internal Revenue Code, no deduction or credit is allowed for any amount paid or incurred during the taxable year in carrying on business if the business (or the activities which comprise the trade or business) consists of trafficking in controlled substances (within the meaning of Schedules I and II of the CSA). The IRS has applied this provision to cannabis operations, prohibiting them from deducting expenses associated with cannabis businesses. Accordingly, Section 280E has a significant impact on the operations of cannabis companies and an otherwise profitable business may operate at a loss, after taking into account its U.S. income tax expenses.

### *Cannabis businesses may be subject to civil asset forfeiture.*

Any property owned by participants in the cannabis industry used in the course of conducting such business, or that is the proceeds of such business, could be subject to seizure by law enforcement and subsequent civil asset forfeiture because of the illegality of the cannabis industry under federal law. Even if the owner of the property is never charged with a crime, the property in question could  still be seized and subject to an administrative proceeding by which, with minimal due process, it



## SUBSCRIPTION AGREEMENT AND
## ACCREDITED INVESTOR QUESTIONNAIRE

could be subject to forfeiture.

### *The Company is subject to proceeds of crime statutes.*

The Company will be subject to a variety of laws that concern money laundering, financial record-keeping and proceeds of crime. These include the Bank Secrecy Act, as amended by Title III of the USA Patriot Act, and any related or similar rules, regulations or guidelines, issued, administered or enforced by governmental authorities in the United States.

In the event that any of the Company's license agreements, or any proceeds thereof, were found to be in violation of money laundering legislation or otherwise, such transactions may be viewed as proceeds of crime under one or more of the statutes noted above, or any other applicable legislation. This could have a material adverse effect on the Company and, among other things, could restrict or otherwise jeopardize the ability of the Company to declare or effect distributions.

### *The Company faces security risks.*

The Company's business premises will be a target for theft. While the Company will implement security measures at each location and will continue to monitor and improve such security measures, its cultivation, processing and dispensary facilities could be subject to break-ins, robberies and other breaches in security. If there was a breach in security and the Company fell victim to a robbery or theft, the loss of cannabis plants, cannabis oils, cannabis flowers and cultivation and processing equipment could have a material adverse impact on the business, prospects, revenue, results of op- eration and financial condition of the Company.

As the Company's business involves the movement and transfer of cash which is collected from dispensaries or patients/customers and deposited into its bank, there is a risk of theft or robbery during the transport of cash. The Company has engaged a security firm to provide security in the transport and movement of large amounts of cash. Employees sometimes transport cash and/or products and, if requested, may be escorted by armed guards. While the Company has taken robust steps to prevent theft or robbery of cash during transport, there can be no assurance that there will not be a security breach during the transport and the movement of cash involving the theft of product or cash.

### *The Company faces exposure to fraudulent or illegal activity.*

The Company faces exposure to the risk that employees, independent contractors or consultants may engage in fraudulent or other illegal activities. Misconduct by these parties could be intentional, reckless and/or negligent conduct. There may be disclosure of unauthorized activities that violate government regulations, manufacturing standards, healthcare laws, abuse laws and other financial reporting laws. Further, it may not always be possible for the Company to identify and deter misconduct by its employees and other third parties, and the precautions taken by the Company to detect and prevent these activities may not always be effective. As a result, the Company could face potential penalties and litigation.

### *The Company is dependent on the popularity of consumer acceptance of the Company's brand portfolio.*

The Company's ability to generate revenue and be successful in the implementation of the Company's business plan is dependent on consumer acceptance of and demand for the Company's products. Acceptance of the Company's products depends on several factors, including availability, cost, ease of use, familiarity of use, convenience, effectiveness, safety and reliability. If these customers do not accept the Company's products, or if such products fail to adequately meet customers' needs and expectations, the Company's ability to continue generating revenues could be reduced.

### *The Company's business is subject to the risks inherent in agricultural operations.*

The Company's business involves the growing of cannabis, an agricultural product. The Company's business is subject to the risks inherent in the agricultural business, such as insects, plant diseases and similar agricultural risks. Although the Company's cultivation will be substantially completed indoors under climate control, some cultivation is completed outdoors, and there can be no assurance that natural elements will not have a material adverse effect on any future production.



## SUBSCRIPTION AGREEMENT AND
## ACCREDITED INVESTOR QUESTIONNAIRE

### *The Company may be adversely impacted by rising or volatile energy costs.*

The Company's cannabis growing operations consume considerable energy, which makes it vulnerable to rising energy costs. Accordingly, rising or volatile energy costs may adversely affect the business of the Company and its ability to operate profitably.

### *The Company may encounter unknown environmental risks.*

There can be no assurance that the Company will not encounter hazardous conditions, such as asbestos or lead, at the sites of the real estate used to operate its businesses, which may delay the development of its businesses. Upon encountering a hazardous condition, work at the facilities of the Company may be suspended. If the Company receives notice of a hazardous condition, it may be required to correct the condition prior to continuing construction. If additional hazardous conditions were present, it would likely delay construction and may require significant expenditure of the Company's resources to correct the conditions. Such conditions could have a material impact on the investment returns of the Company.

### *The Company faces risks related to its information technology systems, and potential cyber-attacks and security breaches.*

The Company's operations depend, in part, on how well the Company and its suppliers protect networks, equipment, information technology ("**IT**") systems and software against damage and threats, including, but not limited to, cable cuts, damage to physical plants, natural disasters, intentional damage and destruction, fire, power loss, hacking, computer viruses, vandalism and theft. The Company's operations also depend on the timely maintenance and replacement of network equipment, IT systems and software, as well as pre-emptive expenses to mitigate associated risks. Given the nature of the Company's products and the lack of legal availability outside of channels approved by the federal government, as well as the concentration of inventory in its facilities, there remains a risk of shrinkages, as well as theft. If there was a breach in security and the Company fell victim to theft or robbery, the loss of cannabis plants, cannabis oils, cannabis flowers and cultivations and processing equipment, or if there was a failure in information systems, it could adversely affect the Company's reputation and business continuity.

Additionally, the Company may store and collect personal information about customers and is responsible for protecting that information from privacy breaches that may occur through procedural or process failure, IT malfunction or deliberate unauthorized intrusions. Any such theft or privacy breach would have a material adverse effect on the Company's business, prospects, revenue, results of operation and financial condition.

### *The Company faces risks related to its insurance coverage and uninsurable risks.*

The Company's business will be subject to a number of risks and hazards generally, including adverse environmental conditions, accidents, labor disputes and changes in the regulatory environment. Such occurrences could result in damage to assets, personal injury or death, environmental damage, delays in operations, monetary losses and possible legal liability.

Although the Company intends to continue to maintain insurance to protect against certain risks in such amounts as it considers to be reasonable, its insurance will not cover all the potential risks associated with its operations. The Company may also be unable to maintain insurance to cover these risks at economically feasible premiums. Insurance coverage may not continue to be available or may not be adequate to cover any resulting liability. Moreover, insurance against risks such as environmental pollution or other hazards encountered in the operations of the Company is not generally available on acceptable terms. The Company might also become subject to liability for pollution or other hazards which it may not be insured against or which the Company may elect not to insure against because of premium costs or other reasons. Losses from these events may cause the Company to incur significant costs that could have a material adverse effect upon its financial performance and results of operations.

### *The Company is dependent on key inputs, suppliers and skilled labor.*

The Company's business is dependent on a number of key inputs and their related costs, including



## SUBSCRIPTION AGREEMENT AND
## ACCREDITED INVESTOR QUESTIONNAIRE

raw materials and supplies related to growing and manufacturing operations, as well as electricity, water and other local utilities. Any significant interruption or negative change in the availability or economics of the supply chain for key inputs, such as the raw material cost of cannabis, could materially impact the business, financial condition, results of operations or prospects of the Company. Some of these inputs may only be available from a single supplier or a limited group of suppliers. If a sole source supplier was to go out of business, the Company might be unable to find a replacement for such source in a timely manner, or at all. If a sole source supplier were to be acquired by a competi- tor, that competitor may elect not to sell to the Company in the future. Any inability to secure required supplies and services, or to do so on appropriate terms, could have a materially adverse impact on the business, prospects, revenue, results of operation and financial condition of the Company.

The ability of the Company to compete, and grow and manufacture will be dependent on it having access, at a reasonable cost and in a timely manner, to skilled labor, equipment, parts and components. No assurances can be given that the Company will be successful in maintaining its required supply of skilled labor, equipment, parts and components. This could have an adverse effect on the financial results of the Company.

### *The Company must attract and maintain key personnel or our business will fail.*

The success of the Company is dependent upon the ability, expertise, judgment, discretion and good faith of its senior management and key personnel. We compete with other companies both within and outside the cannabis industry to recruit and retain competent employees. If we cannot maintain qualified employees to meet the needs of our anticipated growth, our business and financial condition could be materially adversely affected.

### *The Company's sales are difficult to forecast.*

As a result of recent and ongoing regulatory and policy changes in the medical and adult use cannabis industries, the market data available is limited and unreliable. The Company must rely largely on its own market research to forecast sales, as detailed forecasts are not generally obtainable from other sources in the states in which the Company's business operates. Additionally, any market re- search and projections by the Company of estimated total retail sales, demographics, demand, and similar consumer research, including the financial projections included in the PPM, are based on as- sumptions from limited and unreliable market data. A failure in the demand for its products to materi- alize as a result of competition, technological change or other factors could have a material adverse effect on the business, results of operations and financial condition of the Company.

### *The Company may be subject to growth-related risks.*

The Company may be subject to growth-related risks, including capacity constraints and pressure on its internal systems and controls. The ability of the Company to manage growth effectively will require it to continue to implement and improve its operational and financial systems and to expand, train and manage its employee base. The inability of the Company to deal with this growth may have a material adverse effect on the Company's business, prospects, revenue, results of operation and financial condition.

### *The Company may be subject to litigation.*

The Company may become party to litigation from time to time in the ordinary course of business, which could adversely affect its business. Should any litigation in which the Company becomes in- volved be determined against the Company, such a decision could adversely affect the Company's ability to continue operating and could potentially use significant resources of the Company. Even if the Company is involved in litigation and wins, litigation can redirect significant resources of the Com- pany and/or its subsidiaries.

### *The Company faces an inherent risk of product liability claims.*

As a distributor of products designed to be ingested by humans, the Company will face an inherent risk of exposure to product liability claims, regulatory action and litigation if its products are alleged to have caused significant loss or injury. In addition, the sale of the Company's products will involve the risk of injury to consumers due to tampering by unauthorized third parties or product contamination.



## SUBSCRIPTION AGREEMENT AND
## ACCREDITED INVESTOR QUESTIONNAIRE

Previously unknown adverse reactions resulting from human consumption of the Company's products alone or in combination with other medications or substances could occur. The Company may be subject to various product liability claims, including, among others, that the Company's products caused injury, illness or death, include inadequate instructions for use or include inadequate warnings concerning possible side effects or interactions with other substances. A product liability claim or regulatory action against the Company could result in increased costs, could adversely affect the Company's reputation with its clients and consumers generally and could have a material adverse effect on the business, results of operations and financial condition of the Company. There can be no assurances that the Company will be able to obtain or maintain product liability insurance on acceptable terms or with adequate coverage against potential liabilities. Such insurance is expensive and may not be available in the future on acceptable terms, or at all. The inability to obtain sufficient insurance coverage on reasonable terms or to otherwise protect against potential product liability claims could prevent or inhibit the commercialization of the Company's potential products.

### *The Company may be exposed to infringement or misappropriation claims by third parties, which, if determined adversely to the Company, could subject the Company to significant liabilities and other costs.*

The Company's success may depend on its ability to use and develop new extraction technologies, recipes, know-how and new strains of marijuana without infringing the intellectual property rights of third parties. The Company cannot assure that third parties will not assert intellectual property claims against it. The Company is subject to additional risks if entities licensing intellectual property to the Company do not have adequate rights to the licensed materials. If third parties assert copyright or patent infringement or violation of other intellectual property rights against the Company, the Company will be required to defend itself in litigation or administrative proceedings, which can be both costly and time consuming and may significantly divert the efforts and resources of management personnel. An adverse determination in any such litigation or proceedings to which the Company may become a party could subject the Company to significant liability to third parties, require the Company to seek licenses from third parties, require the Company to pay ongoing royalties or subject the Company to injunctions that may prohibit the development and operation of its applications.

### *The Company's products may be subject to product recalls.*

Manufacturers and distributors of products are sometimes subject to the recall or return of their products for a variety of reasons, including product defects, such as contamination, unintended harmful side effects or interactions with other substances, packaging safety and inadequate or inaccurate labeling disclosure. If any of the Company's products are recalled due to an alleged product defect or for any other reason, the Company could be required to incur the unexpected expense of the recall and any legal proceedings that might arise in connection with the recall. The Company may lose a significant amount of sales and may not be able to replace those sales at an acceptable margin, if at all. In addition, a product recall may require significant management attention. Although the Company has detailed procedures in place for testing its products, there can be no assurance that any quality, potency or contamination problems will be detected in time to avoid unforeseen product recalls, regulatory action or lawsuits. Additionally, if one of the Company's significant brands were subject to recall, the image of that brand and the Company could be harmed. A recall for any of the foregoing reasons could lead to decreased demand for the Company's products and could have a material adverse effect on the results of operations and financial condition of the Company. Additionally, product recalls may lead to increased scrutiny of the Company's operations by the FDA, or other regulatory agencies, requiring further management attention and potential legal fees and other expenses.

### *The Company may face unfavorable publicity or consumer perception.*

Management believes the adult use cannabis industry is highly dependent upon consumer perception regarding the safety, efficacy and quality of the adult use cannabis produced. Consumer perception of the Company's products may be significantly influenced by scientific research or findings, regulatory investigations, litigation, media attention and other publicity regarding the consumption of adult use cannabis products. There can be no assurance that future scientific research, findings, regulatory proceedings, litigation, media attention or other research findings or publicity will be favorable to the adult use cannabis market or any particular product, or consistent with earlier publicity. Future re-



## SUBSCRIPTION AGREEMENT AND
## ACCREDITED INVESTOR QUESTIONNAIRE

search reports, findings, regulatory proceedings, litigation, media attention or other publicity that is perceived as less favorable than, or questions earlier research reports, findings or publicity could have a material adverse effect on the demand for the Company's products and the business, results of operations, financial condition and cash flows of the Company. The Company's dependence upon consumer perceptions means that adverse scientific research reports, findings, regulatory proceedings, litigation, media attention or other publicity, whether or not accurate or with merit, could have a material adverse effect on the Company, the demand for the Company's products and the business, results of operations, financial condition and cash flows of the Company. Further, adverse publicity reports or other media attention regarding the safety, efficacy and quality of adult use cannabis in general, or the Company's products specifically, or associating the consumption of adult use cannabis with illness or other negative effects or events, could have such a material adverse effect. Ad- verse publicity reports or other media attention could arise even if the adverse effects associated with such products resulted from consumers' failure to consume such products appropriately or as di- rected.

The use of vape products and vaping may pose health risks. According to the Centers for Disease Control, vape products may contain ingredients that are known to be toxic to humans and may contain other ingredients that may not be safe. Because clinical studies about the safety and efficacy of vape products have not been submitted to the FDA, consumers currently have no way of knowing whether they are safe before their intended use or what types or concentrations of potentially harmful chemicals or by-products are found in these products.

### *The Company may have increased labor costs based on union activity.*

Labor unions are working to organize workforces in the cannabis industry in general. It is possible that certain retail and/or manufacturing locations will be organized in the future, which could lead to work stoppages or increased labor costs and adversely affect our business. We cannot predict how stable our relationships with U.S. labor organizations would be or whether we would be able to meet any unions' requirements without impacting our financial condition. Labor unions may also limit our flexibility in dealing with our workforce. Work stoppages and instability in our union relationships could delay the production and sale of our products, which could strain relationships with customers and cause a loss of revenues which would adversely affect our operations.

### *The Company is subject to general economic risks.*

The Company's operations could be affected by the economic context should the unemployment level, interest rates or inflation reach levels that influence consumer trends and spending and, consequently, impact the Company's sales and profitability.

### *The Company may be negatively impacted by challenging global economic conditions.*

The Company's business, financial condition, results of operations and cash flow may be negatively impacted by challenging global economic conditions.

A global economic slowdown would cause disruptions and extreme volatility in global financial markets, increased rates of default and bankruptcy and declining consumer and business confidence, which can lead to decreased levels of consumer spending. These macroeconomic developments could negatively impact the Company's business, which depends on the general economic environ- ment and levels of consumer spending. As a result, the Company may not be able to maintain its ex- isting customers or attract new customers, or it may be forced to reduce the price of its products. The Company is unable to predict the likelihood of the occurrence, duration or severity of such disruptions in the credit and financial markets or adverse global economic conditions. Any general or market-specific economic downturn could have a material adverse effect on the business, financial condition, results of operations and cash flow of the Company.

Additionally, the U.S. has imposed and may impose additional quotas, duties, tariffs, retaliatory or trade protection measures or other restrictions or regulations and may adversely adjust prevailing quota, duty or tariff levels, which can affect both the materials that we use to package our products and the sale of finished products. For example, the tariffs imposed by the U.S. on materials from Chi-



## SUBSCRIPTION AGREEMENT AND
## ACCREDITED INVESTOR QUESTIONNAIRE

na are impacting materials that we import for use in packaging in the U.S. Measures to reduce the impact of tariff increases or trade restrictions, including geographical diversification of our sources of supply, adjustments in packaging design and fabrication or increased prices, could increase our costs, delay our time to market and/or decrease sales. Other governmental action related to tariffs or international trade agreements has the potential to adversely impact demand for our products and our costs, customers, suppliers, and global economic conditions and cause higher volatility in financial markets. While we actively review existing and proposed measures to seek to assess the impact of them on our business, changes in tariff rates, import duties and other new or augmented trade re- strictions could have a number of negative impacts on our business, including higher consumer prices and reduced demand for our products and higher input costs.

### *State and federal securities laws*

The securities being offered have not been registered under the Securities Act of 1933 (the "**Securi- ties Act**"), in reliance, among other exemptions, on the exemptive provisions of Section 4(a)(2) of the Securities Act and Regulation D under the Securities Act. Similar reliance has been placed on appar- ently available exemptions from securities registration or qualification requirements under applicable state securities laws. No assurance can be given that any offering currently qualifies or will continue to qualify under one or more of such exemptive provisions due to, among other things, the adequacy of disclosure and the manner of distribution, the existence of similar offerings in the past or in the fu- ture, or a change of any securities law or regulation that has retroactive effect. If, and to the extent that, claims or suits for rescission are brought and successfully concluded for failure to register any offering or other offerings or for acts or omissions constituting offenses under the Securities Act, the Securities Exchange Act of 1934, or applicable state securities laws, the Company could be material- ly adversely affected, jeopardizing the Company's ability to operate successfully. Furthermore, the human and capital resources of the Company could be adversely affected by the need to defend ac- tions under these laws, even if the Company is ultimately successful in its defense.

Compliance with the criteria for securing exemptions under federal securities laws and the securities laws of the various states is extremely complex, especially in respect of those exemptions affording flexibility and the elimination of trading restrictions in respect of securities received in exempt transac- tions and subsequently disposed of without registration under the Securities Act or state securities laws.

### *The Securities will not be registered, and no one has passed upon either the adequa- cy of the disclosure contained herein or the fairness of the terms of the offering.*

No state or federal agency has passed upon either the adequacy of the disclosure contained herein or the fairness of the terms of any offering. The exemptions relied upon for such offerings are signifi- cantly dependent upon the accuracy of the representations of the investors to be made to the Com- pany in connection with the offering. In the event that any such representations prove to be untrue, the registration exemptions relied upon by the Company in selling the securities might not be availa- ble and substantial liability to the Company would result under applicable securities laws for rescis- sion or damages.

### *There is no public trading market for the securities, and none may develop. The secu- rities sold in this offering are restricted and not freely transferable.*

There has been no public or private market for the Company's securities, and there can be no assur- ance that any such market would develop in the foreseeable future. There is, therefore, no assurance that the securities can be resold at all, or near the offering price. You will be required to represent that it is acquiring such securities for investment and not with a view to distribution or resale, that it under- stands that the securities are not freely transferable and, in any event, that it must bear the economic risk of an investment in the securities for an indefinite period of time because the securities have not been registered under the Act or applicable state Blue Sky or securities laws. The securities cannot be resold unless they are subsequently registered or an exemption from registration is available.

There is no active trading market for the securities being offered and no market will, in all likelihood, develop in the foreseeable future for any of such securities. Accordingly, you should be prepared to



# SUBSCRIPTION AGREEMENT AND
# ACCREDITED INVESTOR QUESTIONNAIRE

hold the securities acquired in such offerings indefinitely and cannot expect to be able to liquidate any or all of their investment even in case of an emergency. In addition, any proposed transfer must comply with restrictions on transfer imposed by the Company pursuant to the Operating Agreement, and by federal and state securities laws.

***The offering price of the Units has been arbitrarily determined and may not be indicative of actual value or future market prices.***

The offering price was not established in a competitive market but was determined by the Company. The offering price bears no relationship to the Company's assets, book value, historical results of operations or any other established criterion of value. The offering price should not be considered as an indication of the Company's actual value or the value of the securities.

### New Market

The Company's success is materially dependent upon the success of its operation in the Commonwealth of Massachusetts, where marijuana has been legalized for medical and recreational purposes. The Company may have challenges consistent with the legal conflicts, expenses, complications and delays often experienced by businesses engaged in the marijuana industry since it is a relatively new industry that may not succeed as a whole, especially if the federal government elects to change course from prior conduct and prosecute marijuana-related businesses and their owners for violations of federal law. In the event that occurs, there may be a significantly reduced market for the Company's products and services. Furthermore, given the novelty of the marijuana industry, there are very few, if any, businesses with business models that the Company can use as guidance for its operations or build upon for success. The early state of the marijuana industry also means there is very little data or information from competitors for Investors to review and analyze in making their decision whether to invest in the Company. Finally, changes in the marijuana industry could have a negative impact on certain market factors including real estate costs and expenses, prices of marijuana and marijuana-infused products, supply, cost of inputs, and other key aspects of the business of the Company, which could materially affect the financial condition and results of operations of the Company.

### Untested Products

It is expected that the Company will commit significant resources and capital to develop and market both new and existing products (i.e., flavors, formats and formulas). These products are relatively untested, and there can be no assurances that the Company will achieve market acceptance for these products and services. Moreover, these and other new products may be subject to significant competition with offerings by new and existing competitors in the industry. In addition, new products and services may pose a variety of challenges and require the Company to attract additional qualified employees. The failure to successfully develop and market these new products and services could seriously harm the Company's business, financial condition and result of operations.

### Competition

Although the marijuana industry is still new, there has been and will continue to be an increase in competition as the industry grows. As competitors continue to enter the market and become increasingly experienced and sophisticated, competition among marijuana-related businesses will increase and place pressure on earnings of the Company, which could negatively affect the Company's profitability in the future.

### Newly Established and Developing Legal Regime

The Company's business activities will rely on newly established and developing law and regulations in the jurisdictions where it operates. These laws and regulations are rapidly evolving and subject to change with minimal notice. Regulatory changes may adversely affect the Company's profitability or cause it to cease operations entirely. The marijuana and hemp industries may come under the scrutiny or further scrutiny of the FDA, SEC and DOJ, or other federal or applicable state or nongovernmental regulatory authorities or self-regulatory organizations that supervise or regulate the production, distribution, sale or use of marijuana for medical or recreational purposes in the United States. It



# SUBSCRIPTION AGREEMENT AND
# ACCREDITED INVESTOR QUESTIONNAIRE

is impossible to determine the extent of the impact of any new laws, regulations or initiatives that may be proposed, or whether any proposals will become law.  The legal and regulatory uncertainty surrounding the industry may adversely affect the business and operations of the Company including, without limitation, the costs to remain compliant with applicable laws and the impairment of its business or the ability to raise additional capital.

### *Lack of Research and Development*

Scientific research into the benefits and harms of marijuana is in its early stages.  Unclear results from existing studies of marijuana could negatively impact the perception of marijuana medically or recreationally and as a result, could cause consumers and regulators to end their support for marijuana programs.  Such results could significantly impact the business and success of the Company.

**The foregoing list of risk factors does not purport to be a complete enumeration or explanation of the risks involved in an investment in the Company.  Investors are not to construe this document as constituting legal or tax advice.  Before making any decision to invest in the Company, Investors should read all of this document and other materials made available by the Company, including exhibits, and consult with their own investment, legal, tax and other professional advisors.**

5. **Indemnification.**

The undersigned acknowledges that the undersigned understands the meaning and legal consequences of the representations, warranties, agreements, and certifications contained above, and the undersigned hereby agrees to indemnify and hold harmless each of the Company, its managers, officers, representatives and agents from and against any and all loss, damage, or liability due to or arising out of a breach of any representation, warranty, agreement, or certification, or the inaccuracy of any statement, of the undersigned contained in this Subscription Agreement or any other document submitted by the undersigned in connection with the undersigned's subscription for the Securities. The foregoing notwithstanding, nothing in this Subscription Agreement, including the representations, warranties, agreements and certifications contained above, shall be deemed to constitute a waiver of any rights that the undersigned may have under the Securities Act and other U.S. federal and state securities laws.

6. **Miscellaneous.**

   a) This Subscription Agreement may be executed in one or more counterparts all of which taken together shall constitute a single instrument.

   b) This Subscription Agreement shall be governed and construed as binding upon the parties hereto, and their respective successors, and no other person shall have any right or obligation hereunder. This subscription shall be irrevocable and may not be assigned by the undersigned. Subject to the foregoing, this Subscription Agreement shall be binding upon and inure to the benefit of the heirs, executors, administrators, legal representatives, successors and assigns of the undersigned.

   c) This Subscription Agreement constitutes the entire agreement between the undersigned and the Company with respect to the subject matter of this Subscription Agreement and supersedes all prior and contemporaneous agreements between the undersigned and the Company with respect to the subject matter of this Subscription Agreement.

   d) This Subscription Agreement shall be enforced, governed and construed in all respects in accordance with the laws of the Commonwealth of Massachusetts.

   e) The undersigned agrees that he, she, or it may not cancel, terminate, or revoke this Subscription Agreement or any agreement made under this Subscription Agreement and that this Subscription Agreement shall survive the death, disability, or dissolution of the undersigned and shall be binding upon the undersigned's heirs, executors, administrators, successors, and assigns.

   f) The undersigned agrees to provide such further information and to execute and deliver any other documents as the Company may reasonably determine are necessary to comply with any and all laws and ordinances to which the Company is subject, including applicable anti-money- laundering laws and regulations. A delay or failure by the undersigned to produce such additional information may result in a delay or refusal to accept the undersigned's subscription.



# SUBSCRIPTION AGREEMENT AND
# ACCREDITED INVESTOR QUESTIONNAIRE

g)   The Company reserves the right to revoke and rescind this Subscription Agreement and the undersigned's investment if required by the appropriate governmental or regulatory authorities.

h)   The undersigned agrees not to transfer or assign this Subscription Agreement, or any of his, her, or its rights or obligations under this Subscription Agreement, without the express prior written consent of the Company.

i)   All representations, warranties and covenants contained in this Subscription Agreement shall survive (i) the acceptance of the subscription by the Company, (ii) changes in the transactions, documents and instruments described in this Subscription Agreement which are not material or which are to the benefit of the undersigned and (iii) the death or disability of the undersigned.

j)   **THE UNDERSIGNED IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING ARISING OUT OF THE TRANSACTIONS CONTEMPLATED BY THIS SUBSCRIPTION AGREEMENT.**

k)   If any term or provision of this Subscription Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Subscription Agreement or invalidate or render unenforceable such term or provision in  any other jurisdiction.



## SUBSCRIPTION AGREEMENT AND
## ACCREDITED INVESTOR QUESTIONNAIRE

7. **Subscriber Information.** Please provide the following information regarding the undersigned (please print):

Name(s):  SUPPORT FOR WOMEN INC

Type of Entity (if applicable):  CORPORATION

If Securities are to be issued to joint owners, indicate the manner in which ownership in Securities will be held:

27-3936974
_____

Tax Identification or
Social Security Number(s):

Address:  30 N Gould St #R Sheridan WY 82801

Telephone:  307-222-2567
_____

Check here ☐ if the undersigned is a "benefit plan investor," as that term is defined in Department of Labor Regulation 29 C.F.R. § 2510.3-101(±)(2) or an "employee benefit plan," as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended.

*[Remainder intentionally left blank; Signature Page on following page]*



**0102**

## SUBSCRIPTION AGREEMENT AND
## ACCREDITED INVESTOR QUESTIONNAIRE

### SIGNATURE PAGE TO SUBSCRIPTION AGREEMENT FOR INDIVIDUAL INVESTORS

Name: _____

_____
Signature

Date: _____

**SUBSCRIPTION ACCEPTED: DMA HOLDINGS (MA), LLC**

By: _____
Name:  Joseph Villatico
Title: Chief Executive Officer

Date: _____

GREATEST
**0102**

**0103**

## SUBSCRIPTION AGREEMENT AND
## ACCREDITED INVESTOR QUESTIONNAIRE

### SIGNATURE PAGE TO SUBSCRIPTION AGREEMENT FOR ENTITY INVESTOR

Name of investing entity:  SUPPORT FOR WOMEN INC.

By: _____

Name:   Zef Spaci

Title: President

_____

Date:   August 28 2023

**SUBSCRIPTION ACCEPTED: DMA HOLDINGS (MA), LLC**

_____

By: _____

Name:   Joseph Villatico

Title: Chief Executive Officer

Date:

**GREATEST**
**0103**